1
2
3
4
5
6

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| In re: | Chapter 12 Proceeding |
| BULLSEYE HOLDINGS, LLC, | Case No. 4:13-bk-21374-BMW |
| Debtor. | |
| BULLSEYE HOLDINGS, LLC, | Adversary Case No. 4:16-ap-00449-BMW |
| Plaintiff, | **RULING AND ORDER** |
| v. | |
| INTERNAL REVENUE SERVICE, | |
| Defendant. | |

### I.    Introduction

        This matter came before the Court pursuant to the *Complaint for Declaratory Relief* (the "Complaint") filed by Bullseye Holdings, LLC (the "Debtor" and/or "Holdings"), in which the Debtor asks the Court to determine that federal tax liens filed against related entity Bullseye Feeders, LLC ("Feeders") do not encumber certain real property located in Fort Morgan, Colorado (the "Property")[1] which was transferred to the Debtor by Feeders in 2012. The Internal

_____

[1] The Property is legally described as "ALL THAT PART OF THE N1/2, N1/2S1/2 OF SECTION 26, TOWNSHIP 3 NORTH, RANGE 58 WEST OF THE 6TH P.M. LYING SOUTHWESTERLY FROM THE BIJOU CANAL, COUNTY OF MORGAN, STATE OF COLORADO. as known by street and number as: 16098 County Road O, Ft. Morgan, Colorado 80701." (TE 10). References to exhibits that were admitted into evidence at trial are indicated by "TE __."

Revenue Service (the "IRS") has asserted the affirmative defenses of: (1) fraudulent transfer; (2) nominee liability; (3) alter ego liability; and (4) successor liability.[2]

An evidentiary hearing was conducted on February 27, 2018, at which time the parties presented evidence and oral argument. Testimony was provided by Kevin Lamb ("Mr. Lamb"), his wife Brenda Lamb ("Mrs. Lamb"), and IRS Revenue Officer Michael Sandoval ("Mr. Sandoval"). At the conclusion of the trial, the Court allowed the parties to submit post-trial briefing, which was completed on March 29, 2018, at which time the Court took the matter under advisement. Based on the pleadings, the testimony offered, the exhibits entered into evidence, and the entire record before the Court, the Court now issues its ruling.

## II. Statement of Jurisdiction

A bankruptcy court has jurisdiction over "all civil proceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334(b). While this jurisdiction is more limited on a post-confirmation basis, the Ninth Circuit has determined that bankruptcy courts may retain jurisdiction on a post-confirmation basis. The Ninth Circuit has adopted the Third Circuit's test for post-confirmation jurisdiction, under which there must be a close nexus to the bankruptcy plan or proceeding sufficient to uphold bankruptcy court jurisdiction. *In re Pegasus Gold Corp.*, 394 F.3d 1189 (9th Cir. 2005) (citing *In re Resorts Int'l Inc.*, 372 F.3d 154 (3rd Cir. 2004)). Matters affecting "the interpretation, implementation, consummation, execution, or administration of the confirmed plan will typically have the requisite close nexus." *Id.* at 1194. The Ninth Circuit analysis does not hinge on whether a matter is core. *Id.*

Other courts have recognized that plans of reorganization may provide for retention of post-confirmation jurisdiction. *See e.g., In re Johns-Manville Corp.*, 7 F.3d 32, 34 (2d Cir. 1993) (explaining that bankruptcy court retains post-confirmation jurisdiction in Chapter 11 proceeding "to the extent provided in the plan of reorganization").

The Debtor's confirmed Plan contains no retention of jurisdiction provisions; however,

---

[2] The IRS did not raise any affirmative defenses in its *Answer*. The IRS raised these affirmative defenses for the first time in its *Motion for Summary Judgment* (the "Motion for Summary Judgment"). Given the consent of the parties, the Court did not require an amended answer.

this matter was commenced when the Debtor was attempting to refinance the Property in order to fund its Plan. Thus, at the time of commencement, this matter affected the implementation and consummation of the Plan. Though the administrative case has been closed, the Court expressly retained jurisdiction over all pending adversaries. Furthermore, both parties have consented to entry of final orders and judgment by the Court.

The Court finds that is has jurisdiction over this adversary proceeding. This decision constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, as incorporated by Federal Rule of Bankruptcy Procedure 7052.

## III. Issues

1. Whether the Debtor received the Property in a fraudulent transfer such that federal tax liens filed against Feeders remain attached to the Property.

2. Whether the Debtor is the alter ego, nominee, and/or successor of Feeders such that federal tax liens filed against Feeders remain attached to the Property.

## IV. Factual and Procedural Background

The Lamb Family Entities

1. Mr. Lamb and certain members of the Lamb family hold, or in the past have held, membership interests in the following three limited liability companies: the Debtor, which is an Arizona entity; Feeders, which is a Colorado entity; and Lamb Livestock, LLC ("Lamb Livestock"), which is an Arizona entity (collectively, "the LLCs"). (JPT[3] at 3; 2/27/2018 Trial Tr. 6:21-25[4]). The LLCs are tightly knit family operations. (2/27/2018 Trial Tr. 116:19).

2. The precise membership of Holdings is unclear, and Mr. Lamb is unsure of it at any given point in time. He testified that the current members are Priscilla Lamb (his mother) and Mrs. Lamb (his wife), with Joe Lamb (his father) as a previous member (2/27/18 Trial Tr. 7:2-11, 53:17-20). The operating agreement of Holdings however, lists Wyatt Lamb (his son) as

---

[3] JPT refers to the parties' Joint Pre-Trial Statement (DE 49).
[4] References to the trial transcript are by page and line number. For example, "2/27/2018 Trial Tr. 8:2-4" would refer to page 8, lines 2-4 of the trial transcript.

an original member, and Mr. Lamb is unsure when that interest changed because there are no updated ownership statements. (2/27/18 Trial Tr. 54:8-15, 56:7-13; TE 2). The Initial Disclosures in this action listed Priscilla Lamb as the only member (TE 5) and Holdings' bankruptcy schedules from 2013 included Mr. Lamb as a member. (TE 34 at 20).

3.      Mr. Lamb is also unsure of the precise membership of Feeders. The original members were Wyatt, Lamb Livestock and Mr. Lamb (2/27/18 Trial Tr. 61:7-9), and an amended ownership statement from July 2007 listed Wyatt, Mrs. Lamb and Lamb Livestock. (2/27/18 Trial Tr. 61:20-23; TE 3). He also said that he was once a member. (2/27/18 Trial Tr. 62:16-21; TE 40).

4.      Lamb Livestock was an entity initially owned by Mr. Lamb's three children, but Joe Lamb became its only member in January of 2008. (2/27/18 Trial Tr. 60:4-22; TE 33).

5.      The owners of Feeders, Holdings and Lamb Livestock have always been some combination of Mr. Lamb and his immediate family.

6.      Feeders occasionally used Mr. and Mrs. Lamb's home, located at 923 W. Via De Arboles, as an office. (2/27/2018 Trial Tr. 64:20-65:7, 116:23-117:10). Holdings received mail at this address, and Feeders occasionally received mail at this address after its business operations ceased. (2/27/2018 Trial Tr. 64:20-65:7, 116:23-117:10; TE 24 at 101).

7.      Feeders was formed in 2007. Holdings was formed in June 2010. Pursuant to the respective operating agreements, Feeders and Holdings were both established "for the sole purpose of operating a feed yard, marketing cattle, and processing grain." (TE 2 and 4).

8.      Mr. Lamb is and has always been the only manager of Holdings and Feeders. (JPT at 3; 2/27/2018 Trial Tr. 46:7-11, 51:19-22). As manager, Mr. Lamb has the same general powers with respect to both entities, including the final decision-making authority with respect to both entities. (2/27/2018 Trial Tr. 46:12-15, 51:23-52:5; TE 2 and 4).

9.      Pursuant to the Holdings' and Feeders' operating agreements, as manager, Mr. Lamb generally had the power to "[s]ell, convey, mortgage, grant a security interest in, pledge, lease, exchange, or otherwise dispose or encumber any real or personal property[.]" (TE 2 and 4).

10. Neither Holdings nor Feeders held formal membership meetings. (2/27/2018 Trial Tr. 47:13-23, 52:25-53:8).

11. Holdings occasionally paid Feeders' expenses and bills. (2/27/18 Trial Tr. 101:17-24; JPT at 3).

12. The only identified pre-petition bank account in Holdings' name was a Chase Bank account that was opened in September 2012 (the "Chase Bank Account"). (2/27/2018 Trial Tr. 72:18-76:1; TE 8; TE 41).

13. Mr. Lamb used the Chase Bank Account to pay personal expenses, and at one point, it may have been the only bank account that Mr. and Mrs. Lamb used. (2/27/2018 Trial Tr. 76:2-5, 76:19-21).

The Property and Its Encumbrances

14. Feeders acquired the Property in June 2007 from 3T Cattle Company for between $600,000 and $650,000. (2/27/2018 Trial Tr. 77:21-78:1; JPT at 3). At the time it was acquired the Property consisted of 238 acres of land in Morgan County, Colorado. (2/27/2018 Trial Tr. 11:1-3, 18-19). The Property consisted of a feed yard, office, feed mill, corrals, and 80 acres of irrigated farmland. (2/27/2018 Trial Tr. 11:21-24).

15. In the fall of 2007, Wells Fargo provided financing to Feeders, and in exchange, Feeders executed a note and granted Wells Fargo a first-position Deed of Trust against the Property (collectively, the "Wells Fargo Note and Deed of Trust"). (2/27/2018 Trial Tr. 12:21-13:20, 78:2-9; JPT at 3).

16. In 2008, Feeders began operating a cattle yard on the Property. (JPT at 3).

17. For some period of time, Mr. Lamb's father, and/or Holdings, advanced funds to Feeders so that it could make payments on the Wells Fargo Note. (2/27/2018 Trial Tr. 79:22-24).

18. In July 2008, New Frontier Bank extended a line of credit to Feeders in the amount of $500,000, as evidenced by a note in the same amount (the "New Frontier Note"). (2/27/2018 Trial Tr. 15:9-10; 79:25-80:2; JPT at 3-4). The New Frontier Note was secured by a second-

position Deed of Trust on the Property (the "New Frontier Deed of Trust") as well as other assets. (2/27/2018 Trial Tr. 15:17-18; TE 12; JPT at 3-4).

19. The New Frontier Note matured on July 15, 2009 (TE 12).

20. No documents were produced showing that Feeders made any payments on the New Frontier Note before it matured. (2/27/2018 Trial Tr. 80:19-81:3, 83:17-22).

21. On October 8, 2008, Feeders filed a petition under Chapter 12 of the Bankruptcy Code in the District of Arizona, Case No. 2:08-bk-13885-CGC. A plan was not confirmed in that case and on February 9, 2009, Feeders closed its cattle yard operation on the Property. (2/27/2018 Trial Tr. 20:5-8; JPT at 3). Feeders never resumed such operations. (2/27/2018 Trial Tr. 21:24-22:1).

22. Westval Financial 1, LLC ("Westval") purchased the New Frontier Note and Deed of Trust at an FDIC sale in September 2009. (2/27/18 Trial Tr. 22:18-25; TE 14).

23. Between the time that Feeders stopped operating its cattle yard operations and the time that its bankruptcy case was dismissed on February 11, 2010, Feeders leased the 80 acres of irrigated farmland to third parties. (2/27/2018 Trial Tr. 20:12-25).

24. Mr. Lamb testified that Feeders made payments on the New Frontier Note after its Chapter 12 bankruptcy was dismissed using between $40,000 and $60,000 of funds advanced to it by Holdings. (2/27/2018 Trial Tr. 119:3-6, 119:19-23). No documentary evidence of these payments was submitted at trial.

25. In July 2011, Feeders sold the 80 acres of irrigated farmland with all attendant water rights to a neighbor for approximately $320,000. (2/27/2018 Trial Tr. 30:19-25).

26. Approximately $280,000 of the proceeds from the sale of the 80 acres of irrigated farmland were used to pay off the Wells Fargo Note. (2/27/2018 Trial Tr. 31:1-5). The remaining proceeds of approximately $40,000 were paid to Westval. (2/27/2018 Trial Tr. 31:5-6).

27. No appraisal was done at the time of the sale of the 80 acres of irrigated farmland. (2/27/2018 Trial Tr. 85:1-7).

28. Also in July 2011, as part of the sale of the 80 acres of irrigated farmland, Holdings acquired the New Frontier Note and Deed of Trust from Westval. This acquisition was to keep

Westval from selling its note to a third party, thus jeopardizing the lien positions held by Holdings. (2/27/18 Trial Tr. 118:8-119:18; TE 21). There was no evidence presented at trial as to the consideration, if any, paid by Holdings to Westval for the New Frontier Note and Deed of Trust.

29. Feeders did not make any payments to Holdings on the New Frontier Note. (2/27/2018 Trial Tr. 85:22-25).

30. In April 2009, Feeders executed a promissory note in favor of Lamb Livestock in the amount of $500,000 which was secured by a Deed of Trust creating a third-position lien on the Property (collectively, the "Lamb Livestock Note and Deed of Trust"). (2/27/2018 Trial Tr. 28:15-23; TE 15 and 16). To the extent there were records or amounts advanced from Lamb Livestock to Feeders, such records no longer exist or were not provided. (2/27/2018 Trial Tr. 89:15-90:8, 94:20-21; TE 6).

31. The Lamb Livestock Note provides for interest at 7.80% per annum. (2/27/2018 Trial Tr. 95:23-25; TE 15). According to Mr. Lamb, the interest rate was determined based on the interest rate Feeders was paying to other financial institutions. (2/27/2018 Trial Tr. 96:1-6). The Lamb Livestock Note was signed by Lamb Livestock as the maker of the note, rather than Feeders, the intended maker of the note. (2/27/2018 Trial Tr. 96:20-25; TE 15).

32. Feeders never paid Lamb Livestock the amounts due under the Lamb Livestock Note. (2/27/2018 Trial Tr. 96:13-15).

33. In January 2011, Lamb Livestock assigned the Lamb Livestock Note and the beneficial interest in the Deed of Trust to Holdings. (2/27/18 Trial Tr. 97:5-25). Mr. Lamb testified that this assignment was made as a capital contribution, by Joe Lamb and Lamb Livestock, to Holdings. (2/27/18 Trial Tr. 97:5-98:3). No documentation of the capital contribution was submitted at trial. Subsequently, Feeders made no payments to Holdings on the Lamb Livestock Note. (2/27/18 Trial Tr. 99:18-20).

34. On January 1, 2011, Feeders executed a promissory note in favor of Holdings in the amount of $468,000 secured by a fourth-position Deed of Trust on the Property (collectively, the "Holdings Note and Deed of Trust"). (2/27/2018 Trial Tr. 29:1-7; TE 19).

35. The Holdings Note and Deed of Trust provided for interest at 7.80% per annum. (2/27/2018 Trial Tr. 100:12-13; TE 19). Mr. Lamb testified that the interest rate was determined based on the interest rate under the Lamb Livestock Note. (2/27/2018 Trial Tr. 100:14-16).

36. Mr. Lamb testified that the Holdings Note and Deed of Trust were to document loans and advances by Holdings, or its members, to Feeders. (2/27/2018 Trial Tr. 101:10-102:15). No records or other evidence of such advances was submitted at trial.

37. Feeders made no payments to Holdings on the Holdings Note (2/27/18 Trial Tr. 103:20-22).

IRS Involvement, The Bankruptcy and The Transfer

38. In July 2012, Feeders signed a warranty deed to transfer the Property to Holdings, but the warranty deed was deficient and was not accepted for recording. (2/27/18 Trial Tr. 37:3-23).

39. In August 2012, Mr. Sandoval contacted Mr. Lamb regarding Feeders' unfiled employer tax returns for tax years 2008 and 2009. (2/27/2018 Trial Tr. 113:3-7, 113:25-114:2, 135:13-16, 136:14-16; JPT at 4). Mr. Sandoval informed Mr. Lamb that he had to file Feeders' Forms 943 or the IRS would prepare substitute returns. (JPT at 4).

40. Mr. Sandoval testified that he had follow-up communications with Mr. Lamb on several subsequent occasions in the fall of 2012. (2/27/2018 Trial Tr. 136:24, 137:21-22, 138:16).

41. In November 2012, Feeders transferred the Property to Holdings by a warranty deed which was notarized on November 13, 2012 and recorded on November 27, 2012 (the "Transfer"). (TE 10).

42. The warranty deed states that the Transfer was in consideration of $300,000. Mr. Lamb testified that the $300,000 consideration was in the form of forgiveness of debt and the Transfer was in lieu of foreclosure. (2/27/2018 Trial Tr. 104:7-11, 107:18-21, 109:14).

43. Mr. Lamb arrived at the $300,000 consideration amount based on his estimate of the Property's value, taking into account the partial sale of the 80 acres of irrigated farmland in July 2011 for $320,000. (2/27/2018 Trial Tr. 106:18-20).

44.    There are no records of discussions or negotiations with other members of Holdings or Feeders regarding the Transfer. (2/27/2018 Trial Tr. 107:8-9).

45.    There was no formal release of a debt issued by the Debtor to Feeders or any documented record made of debt forgiven by Holdings. (2/27/2018 Trial Tr. 107:22-108:9).

46.    At the time of the Transfer, Feeders was unable to pay its debts as they came due and the Property was the only remaining asset of Feeders. (2/27/2018 Trial Tr. 36:10-11, 104:12-14).

47.    At the time of the Transfer, Holdings held the New Frontier Note and Deed of Trust, the Lamb Livestock Note and Deed of Trust, and the Holdings Note and Deed of Trust, and Feeders was in default on each of the obligations. (2/27/2018 Trial Tr. 36:7-22; 96:13-15; 104:1-11).

48.    According to Mr. Lamb, at the time of the Transfer, the amount owed on the New Frontier Note was between $340,875 and $500,000 (2/27/18 Trial Tr. 110:12-14, 111:10-20).

49.    Holdings did not take any collection actions against Feeders with respect to the New Frontier Note or the Holdings Note prior to the Transfer. (2/27/2018 Trial Tr. 86:11-14; 103:23-25).

50.    No parties introduced appraisals or valuations of the Property as of the time of Transfer.

51.    Feeders valued the Property at $1,250,000 in the schedules it filed in its bankruptcy case on October 8, 2008. (TE 36 at 5).

52.    Holdings valued the Property as being worth approximately $350,000 in the schedules it filed in its bankruptcy case on January 13, 2014. (TE 34 at 3).

53.    On January 1, 2013, Mr. Lamb filed Feeders' outstanding 943 tax returns for 2009. (TE 28).

54.    On May 1, 2013, the IRS filed a tax lien against all of Feeders' property, and rights to property, in the amount of $8,779.85, representing the unpaid balance of the IRS's assessment against Feeders for tax year 2009. (TE 31).

55.     On June 13, 2013, the IRS filed a second tax lien against all of Feeders' property, and rights to property, in the amount of $74,446.33, representing the unpaid balance of the IRS's assessment against Feeders for tax year 2008. (TE 31).

56.     On December 16, 2013, the Debtor filed its petition under Chapter 12 of the Bankruptcy Code in the District of Arizona, Case No. 4:13-bk-21374-BMW (the "Petition Date").

57.     On May 30, 2014, the Debtor's full payment Plan was confirmed. (Admin. Dkt. No. 48; 2/27/2018 Trial Tr. 8:3-4, 8:13-17).

58.     On September 13, 2016, the Debtor filed the Complaint that commenced this adversary proceeding after issuance of a title report showing the IRS liens against the Property. (2/27/2018 Trial Tr. 8:20-24).

## V.     Legal Analysis and Conclusions of Law

### A.     <u>Lien Attachment</u>

The United States may impose a lien on property or rights to property belonging to a taxpayer in order to satisfy that taxpayer's tax deficiency. *Drye v. United States*, 528 U.S. 49, 55, 120 S. Ct. 474, 480, 145 L. Ed. 2d 466 (1999); *see also* 26 U.S.C. § 6321. "Generally, a tax lien does not attach to property that a taxpayer has transferred previously and that no longer belongs to [it]." *United States v. Porath,* 764 F. Supp. 2d 883, 899 (E.D. Mich. 2011), *aff'd,* 490 F. App'x 789 (6th Cir. 2012). However, property that is fraudulently transferred remains subject to the federal tax liens against it. *United States v. Dawes*, 344 F. Supp. 2d 715, 720 (D. Kan. 2004), *aff'd,* 161 F. App'x 742 (10th Cir. 2005).

Likewise, where property is placed in the name of another as the taxpayer's alter ego, nominee, or successor, federal tax liens remain attached to the property. *United States v. Porath,* 764 F. Supp. 2d at 899; *Towe Antique Ford Found. v. I.R.S.*, 999 F.2d 1387, 1391 (9th Cir. 1993) ("It is well settled that creditors can reach property which ostensibly belongs to a third party if that entity is the alter ego of the taxpayer."); *Fourth Inv. LP v. United States*, 720 F.3d 1058, 1066 (9th Cir. 2013) (citing *G.M. Leasing Corp. v. United States,* 429 U.S. 338, 350–51 (1977))

("The Supreme Court has interpreted section 6321 to apply to all property of a taxpayer, including property that is held by a third party as the taxpayer's nominee or alter ego."); *Stramaglia v. United States*, No. 06-13764, 2008 WL 11412164, at *4 (E.D. Mich. Mar. 18, 2008), *aff'd,* 377 F. App'x 472 (6th Cir. 2010) (finding that the operator of a water park facility was a mere continuation of its predecessor such that successor liability attached for purposes of the predecessor's tax liabilities).

## B. <u>Choice of Law</u>

The IRS is pursuing state law theories of fraudulent transfer, alter ego liability, nominee liability, and successor liability. The Property is located in Colorado, the transferor is a Colorado limited liability company, and the transferee is an Arizona limited liability company.

"Courts need not determine choice of law in the absence of a potential conflict of laws." *Renteria v. Ramanlal*, No. CV-07-00658-PHX-ROS, 2009 WL 73675, at *8 (D. Ariz. Jan. 9, 2009). "Generally, a conflict exists where two or more states have a legitimate interest in a particular set of facts in the litigation and the laws of those states differ or would produce a different result." *In re Symons Frozen Foods Inc.*, 432 B.R. 290, 296 (Bankr. W.D. Wash. 2010) (quoting *Estate of Miller v. Thrifty Rent–A–Car Sys., Inc.,* 609 F.Supp.2d 1235, 1244 (M.D. Fla. 2009)) (internal quotations omitted).

The parties assert that for purposes of the IRS's fraudulent transfer, alter ego, nominee, and successor liability claims, it does not matter whether the Court applies Arizona or Colorado law because: (1) both states have adopted the Uniform Fraudulent Transfer Act (the "UFTA") and the relevant provisions of both states' UFTAs are identical; (2) both states employ substantially the same factors to determine nominee and alter ego status; and (3) both states employ the same "mere continuation" test for successor liability.

The Court agrees that Colorado and Arizona employ substantially the same factors to determine nominee and alter ego status and employ the same "mere continuation test" for purposes of successor liability. Therefore, the Court will not engage in a choice of law analysis for purposes of the IRS's nominee, alter ego, or successor liability theories of attachment.

However, although both Colorado and Arizona have adopted the UFTA, Colorado has adopted a relevant provision of the UFTA that Arizona has not adopted. *Compare* C.R.S.A. § 38-8-106 *with* A.R.S. § 44-1005. In addition, both Colorado and Arizona have an interest in applying their respective state's law; Arizona has an interest in its law being applied to its residents and Colorado law has an interest in its law being applied to its residents as well as to real property located within its borders. Accordingly, the Court must engage in a choice of law analysis for purposes of the IRS's fraudulent transfer theories.

"In a bankruptcy case, the court must apply federal choice of law rules, . . . [which] follow the approach of the Restatement (Second) of Conflict of Laws." *In re Vortex Fishing Sys., Inc.*, 277 F.3d 1057, 1069 (9th Cir. 2002).

Pursuant to § 223 of the Restatement (Second) of Conflict of Laws:

> (1) Whether a conveyance transfers an interest in land and the nature of the interest transferred are determined by the law that would be applied by the courts of the situs.
> (2) These courts would usually apply their own local law in determining such questions.

Restatement (Second) of Conflict of Laws § 223 (Am. Law Inst. 1971); *see also* Restatement (Second) of Conflict of Laws § 223 cmt. f (Am. Law Inst. 1971) (noting that courts of the situs generally apply their own local laws when determining fraudulent conveyance issues).

The property at issue is located in Colorado and the transferor, Feeders, is a Colorado-registered limited liability company. Additionally, the communications between the IRS and Feeders regarding the unfiled tax returns that gave rise to the tax liens at issue were primarily between the Colorado entity Feeders and IRS Officer Mr. Sandoval, who was based in Colorado. The only ties that Arizona has to the Property and transaction are with respect to the transferee, Holdings, which is an Arizona limited liability company that filed for bankruptcy in the District of Arizona. Because the Property is located in Colorado and because the Court finds no extraordinary circumstances that would warrant application of Arizona fraudulent transfer law, the Court will apply Colorado fraudulent transfer law.

## C.     Fraudulent Transfer

There are two provisions in the Colorado Uniform Fraudulent Transfer Act ("CUFTA") which address when transfers are fraudulent as to creditors. One provision addresses transfers that are fraudulent as to present and future creditors; the other provision addresses additional transfers that are fraudulent as to present creditors. *See* C.R.S.A. §§ 38-8-105 and 38-8-106.

The CUFTA does not define "present creditor" or "future creditor." However, the CUFTA provides that a "creditor" is "a person who has a claim," and a "claim" is broadly defined as "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." C.R.S.A. §§ 38-8-102(3) and (5).

"[T]ax liabilities, though unassessed, are deemed obligations due and owing at the close of the taxable year." *Espinosa v. Comm'r of Internal Revenue*, 24 F. App'x 825, 826 (9th Cir. 1987) (quoting *Edelson v. Comm'r*, 829 F.2d 828, 834 (9th Cir. 1987)). Thus, the tax liabilities at issue, though unassessed at the time of the Transfer, were deemed obligations due and owing at the close of taxable years 2008 and 2009. Therefore, at the time of the Transfer in 2012, the IRS was a present creditor of Feeders.

The IRS, as the party asserting that the Transfer was fraudulent, has the burden of proving "each and every element of a fraudulent transfer" by a preponderance of the evidence. *In re Thomason*, 202 B.R. 768, 771 (Bankr. D. Colo. 1996); *Boxer F2, L.P. v. Flamingo W., Ltd.*, No. 14-CV-00317-PAB-MJW, 2016 WL 3355566, at *9 (D. Colo. June 17, 2016), *aff'd sub nom. Boxer F2, L.P. v. Bronchick*, 722 F. App'x 791 (10th Cir. 2018); C.R.S.A. § 13-25-127.

### 1.     C.R.S.A. § 38-8-105(1)(a) Theory of Fraudulent Transfer

Pursuant to C.R.S.A. § 38-8-105(1)(a): "[a] transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation . . . [w]ith actual intent to hinder, delay, or defraud any creditor of the debtor[.]"

In determining whether a transfer was made with the actual intent to hinder, delay, or defraud a creditor, a court may consider the following badges of fraud, and draw an inference of

fraudulent intent from such badges of fraud:

> (a)   The transfer or obligation was to an insider;
> (b)   The debtor retained possession or control of the property transferred after the transfer;
> (c)   The transfer or obligation was disclosed or concealed;
> (d)   Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
> (e)   The transfer was of substantially all the debtor's assets;
> (f)   The debtor absconded;
> (g)   The debtor removed or concealed assets;
> (h)   The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
> (i)   The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
> (j)   The transfer occurred shortly before or shortly after a substantial debt was incurred; and
> (k)   The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

C.R.S.A. § 38-8-105(2); *see also Schempp v. Lucre Mgmt. Grp., LLC*, 18 P.3d 762, 764 (Colo. App. 2000), *as modified on denial of reh'g* (July 20, 2000).

The IRS did not present any direct evidence that Feeders transferred the Property with the intent to hinder, delay or defraud the IRS. Thus, the Court must analyze the absence or presence, and circumstances surrounding the badges of fraud.

        a.   <u>Factor 1:  Transfer to Insider</u>

For purposes of the CUFTA, an "affiliate" or "[a] relative of a general partner, director, officer, or person in control of the debtor" is an "insider" of a corporate debtor. C.R.S.A. §§ 38-8-102(8)(b)(VI), (8)(d).

        i.   <u>Affiliate</u>

For purposes of the CUFTA, an "affiliate" is:

> (a)   A person who directly or indirectly owns, controls, or holds with power to vote twenty percent or more of the outstanding voting securities of the debtor, other than a person who holds the securities:

> (I)   As a fiduciary or agent without sole discretionary power to vote the securities; or
>
> (II)   Solely to secure a debt, if the person has not exercised the power to vote;
>
> (b)   A corporation, twenty percent or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote, by the debtor or a person who directly or indirectly owns, controls, or holds with power to vote, twenty percent or more of the outstanding voting securities of the debtor, other than a person who holds the securities:
>
> (I)   As a fiduciary or agent without sole power to vote the securities; or
>
> (II)   Solely to secure a debt, if the person has not in fact exercised the power to vote;
>
> . . . .

C.R.S.A. § 38-8-102(1).

Because neither party has established who the members of Holdings and Feeders were at the time of the Transfer, the Court cannot determine whether Holdings was an affiliate of Feeders at the time of the Transfer.

## ii.   Relative

The CUFTA defines "relative" as "an individual related by consanguinity within the third degree as determined by the common law, a spouse, or an individual related to a spouse within the third degree as so determined, and includes an individual in an adoptive relationship within the third degree." C.R.S.A. § 38-8-102(12).

Though the members of Holdings and Feeders are and have always been relatives of one another, neither Holdings nor Feeders is an individual. Thus, they cannot be said to be related by consanguinity, and are therefore not relatives of one another for purposes of the CUFTA.

## b.   Factor 2: Retention of Possession or Control

Feeders did not retain possession or control of the Property. However, because both entities were and are still managed by Mr. Lamb, for all practical purposes, control over the Property did not change.

c. Factor 3:  Disclosure of Transfer

Neither Feeders nor Holdings concealed the Transfer. The warranty deed was recorded in the public records of Morgan County, Colorado.

d. Factor 4:  Pending Lawsuit or Threat Thereof

There was no pending lawsuit or threat of lawsuit when Feeders transferred the Property to Holdings. Though the warranty deed was not properly recorded until November 2012, Mr. Lamb's testimony and the "July ___, 2012" date in the body of the warranty deed reveal that Feeders intended to execute a transfer of the Property before the IRS, through Mr. Sandoval, contacted Mr. Lamb regarding unfiled tax returns.

e. Factor 5:  Amount of Assets Transferred

At the time of the Transfer, the Property was the only remaining asset of Feeders. Thus, the Transfer was of all of Feeders' assets.

f. Factor 6:  Absconsion

Feeders did not abscond after the Transfer.

g. Factor 7:  Removal or Concealment of Assets

Feeders did not remove or conceal assets after the Transfer.

h. Factor 8:  Value of Consideration

"Reasonably equivalent value" is not synonymous with "market value," though market value is an important factor when determining whether value was reasonably equivalent. *Schempp v. Lucre Mgmt. Grp., LLC*, 18 P.3d 762, 765 (Colo. App. 2000), *as modified on denial of reh'g* (July 20, 2000). Whether the transferor received reasonably equivalent value in exchange for a transfer "requires analysis of all the facts and circumstances surrounding the transaction." *Id.*

i. Value

Under the CUFTA, "[v]alue is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied . . . ." C.R.S.A. § 38-8-104(1). The satisfaction of antecedent debt can only be fair consideration if the debt is valid and existing. *Cf. S. New England Tel. Co. v.*

*Sahara & Arden, Inc.*, No. 2:09-CV-00534-RCJPAL, 2010 WL 2035330, at *7 (D. Nev. May 24, 2010).

At the time of the Transfer, Holdings held the notes and the beneficial interest under three deeds of trust against the Property, specifically the New Frontier Note and Deed of Trust, the Lamb Livestock Note and Deed of Trust, and the Holdings Note and Deed of Trust. It is undisputed that the New Frontier Note and Deed of Trust was entered into between Feeders and New Frontier, a non-insider. According to Mr. Lamb's testimony at trial, the balance of the New Frontier Note at the time of the Transfer was at least $340,875. Mr. Lamb further testified that the Transfer was given in consideration of $300,000 in debt forgiveness by Holdings, and was in lieu of foreclosure. Although no documentary evidence was submitted, the IRS did not present any evidence controverting Mr. Lamb's testimony.

ii.   Reasonably Equivalent

No parties introduced evidence regarding the value of the Property at the time of the Transfer. According to the record, Feeders purchased the Property for between $600,000 and $650,000 in June 2007, and in July 2011, Feeders sold the 80 acres of irrigated farmland for $320,000. At the time of the Transfer to Holdings, the Property had no water rights and needed maintenance. Holdings' bankruptcy schedules valued the Property at $350,000 as of the Petition Date.

The IRS has not shown by a preponderance of the evidence that Feeders received less than reasonably equivalent value in exchange for the transfer of the Property.

i.   Factor 9:  Solvency

Under the CUFTA, "[a] debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation." C.R.S.A. § 38-8-103(1).

Mr. Lamb conceded that Feeders was insolvent at the time of the Transfer.

j.   Factor 10:  Subsequent Incurring of Debt

There was no evidence presented to suggest that Feeders incurred additional debt after transferring the Property to Holdings. Though the IRS filed its tax liens against Feeders

shortly after the Transfer, Feeders incurred the underlying tax debt years before the tax liens were filed.

### k. Factor 11: Transfer to a Lienor Then to an Insider

Feeders did not transfer the Property to a lienor who then transferred the Property to Holdings. Feeders transferred the Property directly to Holdings.

Though several badges of fraud are present, the presence of and circumstances surrounding such badges do not establish by a preponderance of the evidence that Feeders transferred the Property to Holdings with the actual intent to hinder, delay, or defraud a creditor. Neither Feeders nor Holdings took actions to conceal the transfer, there was pre-existing debt owed under the New Frontier Note that was owed by Feeders to Holdings at the time of the Transfer, and the parties attempted to effectuate the Transfer prior to the IRS's initial contact with Feeders.

### 2. C.R.S.A. § 38-8-105(1)(b) Theory of Fraudulent Transfer

Pursuant to C.R.S.A. § 38-8-105(1)(b):

> (1) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
> . . .
> (b) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
> (I) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
> (II) Intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

As discussed above, the IRS has failed to meet its burden of showing by a preponderance of the evidence that the Debtor did not receive reasonably equivalent value in exchange for the Transfer. *See* discussion *supra* (C)(1)(h). Accordingly, the IRS has failed to prove that the

Transfer was fraudulent under C.R.S.A. § 38-8-105(1)(b).

### 3. C.R.S.A. § 38-8-106(1) Theory of Fraudulent Transfer

Pursuant to C.R.S.A. § 38-8-106(1):

> A transfer made or obligation incurred by a debtor is fraudulent
> as to a creditor whose claim arose before the transfer was made
> or the obligation was incurred if the debtor made the transfer or
> incurred the obligation without receiving a reasonably equivalent
> value in exchange for the transfer or obligation and the debtor
> was insolvent at that time or the debtor became insolvent as a
> result of the transfer or obligation.

As discussed above, the IRS has failed to meet its burden of establishing that the Debtor
did not receive reasonably equivalent value in exchange for its Transfer. *See* discussion *supra*
(C)(1)(h). Accordingly, the IRS has failed to prove that the Transfer was fraudulent under
C.R.S.A. § 38-8-106(1).

### 4. C.R.S.A. § 38-8-106(2) Theory of Fraudulent Transfer

Pursuant to C.R.S.A. § 38-8-106(2):

> A transfer made by a debtor is fraudulent as to a creditor whose
> claim arose before the transfer was made if the transfer was made
> to an insider for an antecedent debt, the debtor was insolvent at
> that time, and the insider had reasonable cause to believe that the
> debtor was insolvent.

As an initial step, this provision requires the Court to find that the Transfer was to an
insider. Because it was not established who the members of Holdings and Feeders were at the
time of the Transfer, the IRS has failed to establish that the Transfer was to an insider within the
CUFTA's definition of insider. *See* discussion *supra* (C)(1)(a). Accordingly, the Court does not
get to the other steps under this statute and the Court cannot find that the Transfer was fraudulent
under C.R.S.A. § 38-8-106(2).

Based upon the foregoing, it is the determination of the Court that the IRS has not
established, by a preponderance of the evidence, that the transfer of the Property by Feeders to

1    Holdings was a fraudulent transfer.

3    **D.    Alter Ego Theory**

4    An entity is the alter ego of a taxpayer where:  (1) there is unity of control; and (2)
observing the corporate form would sanction fraud or promote injustice. *Gatecliff v. Great
Republic Life Ins. Co.*, 170 Ariz. 34, 37 (Ariz. 1991); *see also In re Phillips*, 139 P.3d 639, 644
(Colo. 2006) ("An alter ego relationship exists when the corporation is a mere instrumentality
for the transaction of the shareholders' own affairs, and there is such unity of interest in
ownership that the separate personalities of the corporation and the owners no longer exist[,]"
and "justice requires recognizing the substance of the relationship . . . over the form because the
corporate fiction was used to perpetrate a fraud or defeat a rightful claim.").

12    The proponent of an alter ego theory of liability has the burden of establishing both factors
by a preponderance of the evidence. *Griffith v. SSC Pueblo Belmont Operating Co. LLC*, 381
P.3d 308, 313, *as modified on denial of reh'g* (Colo. Oct. 17, 2016); *Ize Nantan Bagowa, Ltd. v.
Scalia*, 118 Ariz. 439, 443, 577 P.2d 725, 729 (Ariz. Ct. App. 1978).

17    1.    <u>Unity of Control</u>

18    Courts examine a variety of non-exclusive factors when determining whether unity of
control exists, including whether:  (1) the entities are operated as distinct businesses; (2) legal
formalities and records are maintained; (3) funds and assets are comingled; (3) there are common
officers or directors; (4) the nature and form of the ownership and control facilitate misuse by an
insider; and (5) one of the entities is thinly capitalized and/or financed by the other. *See In re
Phillips*, 139 P.3d 639, 644 (Colo. 2006); *Airbus D S Optronics GmbH v. Nivisys LLC*, 183
F.Supp.3d 986, 991-92 (D. Ariz. 2016) (quoting *Gatecliff v. Great Republic Life Ins. Co.*, 821
P.2d 725, 728 (Ariz. 1991)).

26    The following evidence is relevant to the Court's analysis of the unity of control prong:

27    • Mr. Lamb is, and has always been, the only manager of Feeders and Holdings,
and as such has had broad, if not exclusive, decision-making authority for

both.

- At all relevant times, the members of Holdings and Feeders have been some combination of Lamb family members, and changes in membership of each was either not documented or not maintained.
- Neither Holdings nor Feeders held regular or formal meetings of the members and corporate formalities were disregarded.
- Corporate records were not maintained, or were destroyed and not recreated.
- Holdings, or its members, advanced funds to pay expenses of Feeders, but no documentation was provided evidencing such advances.
- No evidence was presented that Holdings had a bank account prior to 2012, although it commenced operations in 2010, and such account was used to pay expenses of Mr. and Mrs. Lamb.
- No payments were made by Feeders to Holdings on the obligations acquired by, or issued to, Holdings, including the New Frontier Note, the Lamb Livestock Note or the Holdings Note.
- No evidence was presented that Holdings paid consideration to Westval for acquisition of the New Frontier Note, other than the approximate $40,000 paid to Westval upon the sale by Feeders of the 80 acres of irrigated farmland.
- The operating agreements for Feeders and Holdings state that the entities were established for the same sole purpose of operating a feed yard, marketing cattle and processing grain.
- No documentation was presented as to any forgiveness of debt between Feeders and Holdings.
- At the time of the Transfer, Feeders was unable to pay debts as they became due and the Property was its sole remaining asset.

Although Feeders and Holdings may have originally been operated as distinct business entities, it is clear that this distinction blurred and ultimately disappeared, when Feeders ceased operations. In this case, corporate formalities were ignored or disregarded, all members and the

sole manager were part of the Lamb family, corporate records were not maintained or could not be produced, Feeders was financed by Holdings or other family members, and funds were comingled or used to pay expenses of Feeders, as well as Mr. and Mrs. Lamb.

Given the foregoing, the Court must conclude that the unity of control prong has been met.

### 2. Corporate Fiction Used to Sanction Fraud or Promote Injustice

The second prong of the alter ego analysis evaluates whether justice requires recognizing substance over corporate form. *See Youngren v. Rezzonico*, 25 Ariz. App. 304, 306, 543 P.2d 142, 144 (Ariz. 1975); *McCallum Family L.L.C. v. Winger*, 221 P.3d 69, 78 (Colo. App. 2009).

Upon consideration of the facts in this case, the Court does not find that the transfer of the Property from Feeders to Holdings was an intentional act to defeat the IRS tax claims. The Court does, however, find that given the unity of control, to invalidate the IRS lien against the Property on the basis of the transfer from Feeders to Holdings would promote injustice.

Based on the foregoing, it is the determination of this Court that the IRS has established, by a preponderance of the evidence, that there was unity of control between Feeders and Holdings and that observing the corporate form, as to the transfer of the Property, would promote injustice. The federal tax liens filed by the IRS against the Property therefore remain attached to the property.

Given the Court's determination regarding the alter ego theory, it is unnecessary for the Court to consider the alternative theories raised by the IRS on nominee or successor liability.

### VI. Conclusion

Based upon the foregoing factual and legal analysis, and in consideration of the totality of the evidence presented, the Court finds and concludes that:  1) the transfer of the Property from Feeders to Holdings was not a fraudulent transfer; and 2) that Bullseye Holdings, LLC is the alter ego of Bullseye Feeders, LLC.

Wherefore, for good cause shown,

1   IT IS HEREBY ORDERED that the federal tax liens against Bullseye Feeders, LLC

2   continue to encumber the Fort Morgan, Colorado property, legally described as:

>           ALL THAT PART OF THE N1/2, N1/2S1/2 OF SECTION
>           26, TOWNSHIP 3 NORTH, RANGE 58 WEST OF THE 6TH
>           P.M. LYING SOUTHWESTERLY FROM THE BIJOU
>           CANAL, COUNTY OF MORGAN, STATE OF
>           COLORADO.
>
>           as known by street and number as: 16098 County Road O, Ft.
>           Morgan, Colorado 80701

**DATED AND SIGNED ABOVE.**